# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

RYAN MARK WYNGARDEN,

      Defendant-Appellant.

UNPUBLISHED
August 11, 2015

No. 321736
Ottawa Circuit Court
LC No. 13-037270-FC

Before: TALBOT, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

A jury convicted defendant of two counts of first-degree premeditated murder, MCL 750.316(1)(a), finding that defendant shot and killed his sister, Gail Brinks (Gail), and her husband, Rick Brinks (Rick). Defendant was sentenced to two concurrent life sentences without the possibility of parole. He now appeals as of right. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

Gail and Rick were murdered at their home on Ransom Street on November 21, 1987. They had attended a wedding for one of Rick's high school friends, leaving the reception sometime around 11:00 p.m. That was the last time they were seen alive. When the two failed to appear at their respective jobs on Monday, Rick's parents and Rick's employer went to investigate. They made a gruesome discovery. Gail had been shot in the head three times while she was lying in bed. Rick had suffered two gunshot wounds to the left side of his head while seated in the driver's seat of his Blazer. The home did not appear to have been ransacked. A purse, two watches, identification, and wallet were on the kitchen counter; there was cash found throughout the house. Gail and Rick were still wearing jewelry at the time of their autopsies. No weapon, shell casings, or bullets were found at the crime scene; the only bullets found were in the victims' bodies. The initial police investigation failed to result in an explanation for what occurred and no arrests were made. However, the cold case unit of the Ottawa County Sheriff's Department once again turned their attention to the murders in 2011, re-investigating and re-interviewing several individuals. As a result of these efforts, defendant was arrested in January 2013.

At trial, the most damaging testimony came from defendant's wife, Pam Wyngarden (Pam). At the time of the murders, she and defendant were dating and her maiden name was

-1-

Maracchini. Pam had a six month old son, Nathan, when she met defendant. Pam testified that on Saturday, November 21st, she told defendant that they needed to do laundry. They went to Pete's Laundromat at approximately 5:00 or 6:00 pm and did not get back home until 8:00 p.m. Defendant left for a couple of hours and Pam did not question where he was going. He came back later that night and they smoked marijuana and had sex before he left again. Pam did not see defendant again until Sunday, November 22nd at 9:00 a.m. when he came knocking on the door. Defendant was upset and holding his head. Pam testified "that's when he told me that he shot Rick and Gail." Pam asked defendant to leave and he did. But he called later and asked if he could come back over. Pam reluctantly agreed. Defendant said he was going to take Pam back to his house, but he first stopped at Rick and Gail's home. Pam testified: "we stopped at Rick's truck and that's when I saw Rick. Then Ryan grabbed my wrist, walked me to the house, to the bedroom, and that's where I saw Gail. He lifted up the pillow and said to me, 'If you go to the police or tell anybody what I did here, this could happen to you.'"

Pam testified that she went back to defendant's house for the rest of the night. Pam woke up at 6:00 a.m. Sunday morning to fix Nathan a bottle and noticed that defendant's friend, James Meacham (Jimbo), was over. Defendant told Jimbo that he just found out that his sister and her husband had been killed.[1] After Jimbo left, Pam asked defendant to take her home so that she could get ready for work. Before they left, defendant brought out a .22 revolver and showed it to her, along with a bag of clothes he had worn the night before. He put the things in the back of his car. In the car ride back to Pam's apartment, defendant again warned Pam not to go to the police or "what happened to Gail could happen to me, so I just felt like I had to do what he asked." Defendant asked Pam to provide an alibi and tell the police that they were at Roz Dirkse's (Roz) house doing laundry and watching her children.

Pam testified that when she asked defendant why he killed his sister and Rick defendant said that it was because "he was jealous and that he had a sexual relationship with his sister." Defendant did not want Rick to find out about it. Defendant told Pam that he had gone to Rick and Gail's home that Saturday night where they had a "heated discussion" about some family matter. Rick asked defendant to leave, but defendant came back saying he had car trouble. Pam testified that when Rick went out to his truck "that's when Ryan shot him." Defendant then went into the house. Gail was in bed and he shot her.

Pam testified that she attended the funerals and felt like she had to brush her knowledge "under the rug" and "pretend like it never happened." Three or four months later defendant reminded Pam of their alibi and the threat he previously made. On several occasions, defendant suggested blaming a motorcycle gang for the murders because he had heard a rumor that the man

---

[1] Jimbo testified that he found out about the murders from defendant. Jimbo would often go over to defendant's house in the early morning to have coffee. One morning defendant answered the door and Pam was standing behind him and Nathan was on the ground. Defendant told Jimbo that Gail and Rick had passed away and Jimbo assumed that they had died of carbon monoxide poisoning or a house fire. Later that same day he learned from a co-worker that they had actually been murdered. Jimbo was not sure whether this happened on a Monday or a Tuesday.

who lived in the house before Rick and Gail was a member of a motorcycle gang. When police interviewed Pam in December 1987, she told them that she and defendant were doing laundry at Roz's house. Pam proceeded to marry defendant approximately a year later and they had three children together – Caleb, Elisabeth (Elisa), and Benjamin. Pam was the family's breadwinner and defendant was a stay-at-home father and home-schooled their children over Pam's objections.

Pam testified that cold case detectives called defendant in September 2012 and set up interviews with both defendant and Pam. Pam testified that she was nervous about her October 1, 2012 interview. She and defendant drove separately to their interviews; Pam followed defendant because she did not know the way. Prior to the interview, defendant reminded Pam that the alibi was "true" and that they were at Roz's on the night of the murder. Pam's initial interview lasted approximately three hours. Pam ultimately admitted to the officers that the alibi she gave in 1989 was false. She did not reveal, however, that defendant had confessed to the murders because she was afraid she would be in trouble for withholding the information for all those years. Pam denied being forced or coerced by the detectives; her statement was voluntarily given. Pam simply could not "have this burden on my shoulders anymore."

Defendant was interviewed after Pam left. Pam testified that he called her at home after his interview and said "'I can't believe that you threw me under the bus.'" Defendant complained that the detectives must have mistreated her. When he got home he was still "ranting and raving" about the detectives. Pam did not feel the same way about the detectives as defendant; she did not believe she was mistreated. Defendant then proceeded to leave a "nasty message" on one of the officer's voicemail. Defendant also mentioned the motorcycle gang as an attempt to deflect attention. Defendant told Pam not to speak to the detectives again unless they had a lawyer there.

There was a three-month gap before the detectives contacted Pam at work on January 15, 2013. Pam elected to have a human resources representative present during the interview. Once again, Pam was not ready to tell the detectives that defendant was responsible for the murders and she did not implicate him at that second interview, but she did agree to meet with the detectives a third time on January 18, 2013. At the third meeting, the detectives met with Pam at the security office where she worked. The human resources representative escorted Pam to the office, but did not stay for the third interview. Pam testified that she had something "inside me . . .it was time for me to lift the burden off my shoulders to tell the detectives what I knew." Pam did not want Lisa there to hear what she had to say. Pam testified that her participation in the third interview was voluntary and she was not threatened, coerced or bullied. It was at this third interview that Pam finally revealed that defendant killed Rick and Gail. After Pam told the officers about the murders, they suggested that they move from the security office to the sheriff's department. Therefore, the third interview took place initially at Pam's work and then moved to the sheriff's department.

Defendant was arrested and remained in jail from the time of his arrest. Pam testified that she was interviewed a fourth time on October 31, 2013. At that time she provided additional information, including the fact that she had been to the murder scene the day after the murders and had seen the bodies. Pam testified that she provided the information voluntarily. She did not share it in any of the prior interviews because "I wasn't ready to tell them back then."

During cross-examination, defense counsel pointed out to Pam that she said "I can't remember" no less than 32 times during her first contact with the detectives. Defense counsel also noted that the detectives accused Pam of helping her old boyfriend, Jerry Himes (Jerry), break out of jail. At that first interview, Pam told detectives that the false alibi was her idea. She told them that she loved defendant and was confident he had nothing to do with the murders.

Defense counsel questioned Pam at length about her January 18th interview, pointing out that Pam initially consistently denied that defendant had anything to do with the murders. Pam denied that she was under pressure from detectives; she just was not ready to tell them everything. Defense counsel also pointed out inconsistencies between Pam's testimonies at the preliminary examination and at trial and the various statements she made in the four interviews.

The prosecutor presented evidence that defendant confessed to Daryl Cain (Daryl), a so-called jailhouse snitch. The prosecution also presented evidence of statements that defendant made to others, which were deemed "odd." His aunt Narva testified that both defendant and Gail called her the day before the murders. Gail complained that defendant owed her money. Defendant complained that Gail considered herself too good for their family; she had refused to allow their parents to park their trailer in her driveway. At Gail's funeral defendant asked Narva, "'Do you think I could've killed them?'" Defendant also told Narva that Rick and Gail would "probably still be alive if they'd let his folks come out there and stay." In the days after the murder, defendant told his sister, Cheryl, "You know, sometimes I wonder if I couldn't have done this." Defendant told Cheryl that he could picture someone going down a hallway and telling Gail, "I'll be right back." At the time, Cheryl attributed defendant's behavior to shock. A family friend testified that she ran into defendant and his mother at Meijers and that they offered to sell her the waterbed in which Pam was murdered. Defendant talked about the crime and made troubling comments.

The prosecution also presented several witnesses to testify as to defendant's sexual relationship with his sister. Defendant's old girlfriend, Crys, testified that she remained friends with defendant even after they broke up. The week of the murders, a very emotional defendant told Crys that he and Gail had a sexual relationship as teenagers and that the "last time" he forced Gail. Defendant also told Crys about a time when he was on Rick's boat and was looking "lustfully" at Gail in a bikini when he noticed that Rick was watching him. Defendant told his stepson, Nathan, that he and Gail had a "touchy-feeling type thing" and that they came close to having intercourse. Sometimes Gail would say "no" but defendant would force her. Nathan's wife, Heather, testified that she was there when defendant said that he and Gail had a sexual relationship – "he said it was like exploring." Defendant described it as "natural teenager stuff."

Defendant presented a fair amount of evidence in his defense. He presented numerous witnesses in support of his theory that the Brinks were murdered either by: 1) a motorcycle gang that meant to kill the Brinks' predecessor owner of the Ransom Street home; or, 2) by Gail's employer because Gail had allegedly discovered certain "inconsistencies" or "irregularities" at work.

Defendant also testified at trial. Defendant explained the sexual encounters he had with Gail when they were young. When he and Gail were living in Florida– defendant was approximately 12 and Gail was approximately 10 – they were both naked after a shower and they

were "just comparing body parts, so to speak" and "[t]here was nothing sexual about it." Another incident occurred after the family moved back to Michigan and defendant was approximately 13 and Gail was 11. Defendant was "snooping" in his father's friend's car and found a marijuana pipe. He and Gail smoked it and were "two stoned brother and sister" who "just groped on each other a little bit." While it was inappropriate, defendant denied that things progressed beyond that and denied ever forcing her. The third and final incident occurred when defendant was 14 or 15 and Gail was 13. Once again, they were high on marijuana. They were fully clothed. Gail straddled defendant but then complained that it hurt, so they switched positions with defendant on top. Nothing happened because Gail could hear their father wake up. Defendant denied raping Gail.

Defendant testified that he and Pam "infrequently" babysat for Roz. In fact, the only time he remembered babysitting for her was the night of the murders. That evening, he and Pam went to Pete's Laundromat. Pam did not have enough money to finish the laundry, so they went over to Roz's. There was some "gray area" but defendant remembered that Roz and her friend Amy went to a bar and came back around 2:00 a.m.

Defendant testified that at the time of the murders, defendant's parents had borrowed a camper and were living in defendant's driveway. They had sold their home and were without a place to stay for approximately a month and a half. Defendant received letters from the township saying that it was not permissible to have them living in the driveway. Gail refused to let their parents keep the camper at her house and defendant intended to go out and speak with her on Sunday. Defendant denied being angry; he understood that Gail had concerns about their youngest siblings being at her house. That Sunday, defendant was running low on gas and cigarettes and stopped at a gas station. He used the payphone to call Gail, but no one answered. He decided to go to Pam's house instead and arrived at approximately 1:00 or 2:00 p.m. He did not like spending the night at Pam's, so he believed he went home, though he had no independent recollection.

Defendant testified that he first heard about the murders on Monday at approximately 5:00 p.m. when he was at his brother Breck's house looking for his parents. Later that day, defendant went to Pam's. The news was on and defendant said "that was my sister and Rick." He was numb. Defendant testified that he and Pam "ended up making love and that's when my heart was knit to her and never been apart from her since until all this."

Defendant testified that he loved his sister. She co-signed on a car loan for him and even made one of his payments. They talked frequently. Defendant denied being jealous of Rick and Gail's relationship. He denied any sexual or financial jealousy. He denied that it would bother him if Gail revealed to Rick what had happened when they were younger.

Defendant believed that Pam was mistreated in her interviews and that she was coerced into making statements against him. He testified that Pam's first interview at the sheriff's department in October 2012 was supposed to last a half hour, but she was in there for closer to three hours. Defendant admits that he began beating on the glass and demanding to know what was happening. He was worried about Pam, who had worked all week and had sore feet. Defendant denied that he was angry that Pam told officers that the alibi was a lie; he was merely "mystified" and "perplexed." After the interviews, Pam told defendant that the detectives told

her not to confide in anyone "about what they did to her" or she would be charged. Thereafter, she put up a "wall" between her and defendant.

Defendant admitted that he tried contacting Pam from jail. He just wanted to understand why she was doing what she was doing. He was "grief-stricken" and probably sent 29 letters. He just wanted her to stop lying. The tenor of letters to friends and family changed over time. At first, defendant accused Pam of lying and simply wanting a divorce, but then defendant came to realize that maybe Pam had been manipulated. Defendant was convinced "this would not be happening if [the detectives] didn't pressure her in [] the way they did." Once he saw the tapes of the police interviews with Pam, he better understood what was happening. He likened it to "a wolf pack chewing on an innocent lamb." Defendant denied lying to Pam that their alibi had been confirmed; he thought the individuals who would have supported the alibi had been interviewed 25 years ago. Defendant still did not understand why Pam would falsely accuse him except for maybe the "movie rights that's been talked about in the family that may be available now." Pam was now "locked into this thing," meaning that she could not get out of telling the wrong story. Defendant admitted that he had numerous outbursts during the February 2013 preliminary hearing, calling Pam a liar and a "black hearted evil woman." Defendant believed that he was entitled to "some righteous indignation." The district court judge had him removed from the courtroom.

Defendant strenuously denied being involved in the murders and further denied ever threatening Pam. He cooperated with detectives and even liked them after meeting them the first time, but "when you get put on the hot seat and they start grilling you, they're not so nice." He initially told detectives that he was "probably high" on the night of the murders and that he "thinks" he was babysitting for Roz. He could not remember who Roz might have gone out with, but explained that "it was a stressful situation and I hadn't thought about it in years. . ." He also did not recall the specific time Roz returned. In one interview, defendant admitted that there was penetration with Gail, but claimed that he was in a stressful situation and may have said things that were not true. If defendant told his niece Michelle that he regretted not having a chance to apologize to Gail because he felt like he raped her, it was because he had just been arrested and was "neurotic" and "anxiety-ridden. I didn't choose my words carefully." In another call to his sister Lynn, defendant once again said he had raped Gail but claimed that the statement was "taken out of context."

Defendant called fellow inmate Daryl "the baby raper" with "scummy teeth." Defendant spoke about the Bible and his 40-day fast while in jail. He admitted that he spoke about his case to "just about anybody that would listen," but maintained his innocence.

Defendant also presented Dr. Deborah Davis, Ph.D., who testified about memory. Her Power Point presentation was entitled Memory on Trial: Clues to Witness Accuracy, and dealt with evaluating someone else's memory and the conditions under which the memory is most likely to be accurate versus when it is most likely to be inaccurate. Davis explained that failures in memory could occur in encoding (the circumstances that existed when something is observed, i.e., time to observe, stress, impairment, focus, distraction, and trauma), storage (which was the interval between the observation and reporting), and retrieval (when a person was asked to recount the experience).

Davis testified that trauma impacted memory. For example, an individual might remember being mugged, but not be able to remember the details of the event. Stress, distress, and trauma not only affected encoding, but also affected retrieval. As another example, an individual may go into a test with full knowledge of the material, but the anxiety of the testing process may impair his ability to retrieve that information.

In terms of storage and the passage of time, Davis testified that people could completely forget something or the memory could become different from what really happened. Obviously, the longer the time between an occurrence and retrieval, the more likely the information would get lost. Memories become faded and vague. There can also be "source dissociation" where an individual remembers the information, but not where it came from.

Davis testified that "interference" occurs when other things happen over time that changes the memory from what it once was. This might occur when an individual reads newspaper articles or hears another person's account of events. The unintentional consequence is that new information replaces the original information and potentially creates "false memories." Memory is a story "[a]nd if you change that story by thinking about it, by listening to other people's stories, by listening to the media and so on, then it changes the subjective sense of memory that you have about what happened." It is easier to adopt other people's suggestions and report simply on the belief of what happened, which leads to guessing. People may even come to "remember" things that never happened.

Davis testified that "relevance-supportive" knowledge can change over time. Meaning, an individual's past experience will tell him whether something is plausible, i.e., whether a person is capable of doing something. There is also the "hindsight effect," which tends to make individuals remember the past differently. The "memory is changing to fit what you know now or what you believe to be true now." There is the potential for "memory conformity" when an individual believes that someone has direct knowledge of an occurrence. When witnesses talk, their memories converge. "You're not just lying or anything. You're thinking, okay, it must be that way because everyone else seems to think so."

Davis testified that people such as therapists or police officers may suggest that an event is so important that it is unforgettable so that if an individual does not remember detail, they believe that the individual must "unblock" the alleged repressed memory, which is "a good recipe for creating some false memories." Some people have even provided detailed false memories of murdering family members "essentially through the way they're interviewed." An individual might guess if put under pressure. Multiple forensic interviews can create cumulative error. The "more suggestive interviews you're exposed to, the more memory is going to be affected[,] as well as the person can become more and more likely just to go along to get along and get it over with."

The jury found defendant guilty of two counts of first-degree premeditated murder and he was sentenced to two life terms without the possibility of parole. Defendant moved for a new trial, arguing that the trial court erred in limiting Davis's testimony by not allowing her to testify as to specific police interrogation techniques. Defendant further argued that it was error for the trial court to refuse to admit the three interview tapes to show that Pam was subjected to prolonged interrogation, which resulted in false memories. Defendant also argued that the trial

court erred in admitting evidence of defendant's alleged sexual contact with Gail because such evidence was extremely prejudicial. The trial court denied defendant's motion and he now appeals as of right.

## II. EXPERT TESTIMONY ON FALSE CONFESSIONS

Defendant first argues that the trial court abused its discretion when it refused to allow Davis to testify about how various interrogation techniques could lead to Pam making a false accusation. We disagree.

"This Court reviews for an abuse of discretion a circuit court's decision to admit or exclude evidence. An abuse of discretion results when a circuit court selects an outcome falling outside the range of principled outcomes. We review de novo constitutional questions and issues of law underlying evidentiary rulings." *People v Kowalski*, 492 Mich 106, 119; 821 NW2d 14 (2012) (footnotes omitted).

MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"The party proffering the expert's testimony must persuade the court that the expert possesses specialized knowledge which will aid the trier of fact in understanding the evidence or determining a fact in issue." *People v Smith*, 425 Mich 98, 112; 387 NW2d 814 (1986). Because the critical inquiry is whether the expert's testimony will aid the factfinder, the expert testimony must touch on something "beyond common knowledge":

> [W]hether expert testimony is beyond the ken of common knowledge is a commonsense inquiry that focuses on whether the proposed expert testimony is on a matter that would be commonly understood by the average person. If the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute, then expert testimony is unnecessary. [*Kowalski*, 492 Mich at 123 (footnote omitted).]

However, even if expert testimony would assist the trier of fact, the proffered testimony must also meet the so-called "trilogy of restrictions," which includes a searching inquiry into "qualification, reliability, and fit." *Elher v Misra*, 308 Mich App 276; ___ NW2d ___ (2014), slip op, p 8.

> [A] court evaluating proposed expert testimony must ensure that the testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable

data, principles, and methodologies that are applied reliably to the facts of the case. Although these considerations are separate and distinct and must each be satisfied independently, they are, in fact, overlapping in nature. [*Kowalski*, 492 Mich at 120-121 (footnote omitted).]

"MRE 702 requires the trial court to ensure that each aspect of an expert witness's proffered testimony—including the data underlying the expert's theories and the methodology by which the expert draws conclusions from that data—is reliable." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 779; 685 NW2d 391 (2004), citing *Daubert*. Our Supreme Court has held:

> This gatekeeper role applies to all stages of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data. Thus, it is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine). The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology. [*Gilbert*, 470 Mich at 782 (footnote omitted).]

An additional restriction exists – "[t]he facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence." MRE 703. "This rule permits an expert's opinion only if that opinion is based exclusively on evidence that has been introduced into evidence in some way other than through the expert's hearsay testimony." *People v Fackelman*, 489 Mich 515, 534; 802 NW2d 552 cert den 132 US 735 (2011).

The trial court permitted the expenditure of public funds for defense counsel to consult Davis in order to explain situational and/or psychological factors that might lead to a false confession. The trial court warned, however, that "defendant's request to appoint an expert on interview and interrogation tactics does not mean that any and all opinions of this expert are admissible. Specifically, if Defendant seeks to have the expert testify that certain police interview tactics lead to false statements, then this testimony would be subject to a *Daubert*[2] hearing. . . . Defendant must establish more than 'an interview method may or can lead to false statements,' rather there must be a correlation between certain techniques and false confessions."

Armed with Davis's report, the prosecutor filed a motion to conduct a *Daubert* hearing or exclude the testimony. A hearing was held midway through trial. Defendant sought to have Davis testify in three different ways: 1) general testimony regarding memory and false memory; 2) general testimony regarding how certain police interrogation techniques are used; and 3) specific testimony regarding the application of these techniques to Pam. Defense counsel hoped to introduce portions of the interviews as evidence. The trial court ruled that Davis could offer general testimony regarding memory and false memory, but that she would not be able to testify as to specific police interrogation techniques and how those techniques may have impacted Pam.

---

2 *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

Defendant relies exclusively upon *Kowalski* in support of his position that Davis should have been permitted to testify regarding police interrogation techniques and whether those techniques were used during Pam's "interrogation." However, *Kowalski* has no application to the case at bar for at least two reasons: 1) Pam's statements were not "confessions," and, 2) having never even met Pam, Davis possessed no information regarding Pam's psychological makeup that would have made her particularly susceptible to coercive interrogation techniques.

The defendant in *Kowalski* was accused of killing his brother and sister-in-law. He was questioned four times over the course of several days and at various locations. At his third interview, the defendant indicated that there was a "50 percent chance" he killed them, but that he had only a blurred dream-like memory of shooting them. The defendant ultimately confessed to the murders during the last interview, following a night in jail. The defendant's confession was the primary evidence implicating him the in the murders. *Kowalski,* 492 Mich at 110-111. The defendant moved to suppress his statements, claiming that the police officers caused him to make a false confession. He offered two experts, Dr. Richard Leo, a social psychologist, and Dr. Jeffrey Wendt, a clinical and forensic psychologist. *Id.* at 111-113. Leo proposed to testify that certain police interrogation techniques could cause false or unreliable confession. Wendt hoped to testify that, after administering a battery of psychological tests on the defendant, he concluded that the defendant's traits made him particularly susceptible to coerced internalized false confession. *Id.* at 114-115. The trial court concluded that the expert testimony did not meet the threshold for admission and this Court affirmed. *Id.* at 115-118.

The Michigan Supreme Court disagreed with the lower courts' conclusion that a false confession did not constitute behavior contrary to common sense: "expert testimony bearing on the manner in which a confession is obtained and how a defendant's psychological makeup may have affected the defendant's statements is beyond the understanding of the average juror and *may* be relevant to the reliability and credibility of a confession." *Id.* at 126 (emphasis added). This was true because "a false confession was counterintuitive behavior that is not within the ordinary person's common understanding, and thus expert assistance can help jurors understand how and why a defendant might confess falsely." *Id.* at 28. The Court explained:

> Our conclusion that a confession challenged as false constitutes behavior contrary to common sense finds additional support in a longstanding presumption deeply rooted in our country's legal system: A person does not ordinarily make untruthful incriminating statements. As the United States Supreme Court explained more than 100 years ago, confessions are given great weight on the basis of the presumption that one who is innocent will not imperil his safety or prejudice his interests by an untrue statement. Our "statement against interest" exception to the hearsay rule embodies this presumption and allows the admission of hearsay statements, which are typically considered untrustworthy, if the statement tended to subject the declarant to criminal liability, so that a reasonable person would not have made the statement unless believing it to be true. The premise underlying this hearsay exception is the common-sense intuition that a reasonable person would be expected to lie, if at all, only in his own favor, and would not harm himself by his own words. Despite this well-established, commonsense presumption, embodied in our evidentiary rules, that a person does not make false incriminating statements, both the Court of Appeals and the circuit

court simply presumed that the average juror possessed the knowledge to evaluate factors that might lead to a false confession. This conclusion is not grounded in the necessary commonsense inquiry and lacks any legal basis. [*Id.* at 127-129 (internal quotation marks and footnotes omitted).]

The Court concluded that "because the claim of a false confession is beyond the common knowledge of the ordinary person, expert testimony about this phenomenon is admissible under MRE 702 *when it meets the other requirements* of MRE 702." *Id.* at 129 (emphasis added). The Court cautioned that while an expert may testify about counterintuitive behavior, the expert could not comment on the ultimate issue of whether an individual was telling the truth. *Id.*

The Court's entire basis for concluding that expert testimony *may* be admissible was its conclusion that an individual does not ordinarily make false *incriminating* statements. A "confession" is "[a] criminal suspect's oral or written acknowledgement of guilt, often including details about the crime." Black's Law Dictionary (9th Ed), p 338. Here, Pam did not make a confession. She was not a criminal suspect, nor did she acknowledge guilt. Instead, she implicated defendant in the murders. An "accusation" is "[a] statement that a person has engaged in an illegal or immoral act." Black's Law Dictionary (9th Ed), p 24. In its response to the dissent, the Court in *Kowalski* noted:

> We agree with the dissent that questions of eyewitness identification, fading memories, witnesses' body language, and the like involve obvious human behavior from which jurors can make "commonsense credibility determinations." None of this behavior is recognized in our law as having special indicia of reliability. A statement against penal interest, on the other hand, is presupposed to be trustworthy and credible, which is precisely why an alleged false confession is a counterintuitive behavior that may, like other counterintuitive behavior recognized by our caselaw, require the aid of expertise to explain. The legal principles that *are* the foundation of our holding do not also support the need for expert testimony to explain the common human behavior described by the dissent. [*Kowalski*, 492 Mich at 143 (footnoted omitted).]

An accusation is not the same as a confession. Unlike a false *confession*, a false *accusation* is not counterintuitive at all. People accuse others of wrongdoing all of the time and for various reasons. For example, defendant claimed that Pam was lying in order to divorce him.

Moreover, unlike the defendant in *Kowalski*, who sought to disavow his confession, Pam testified that she was truthful during the interviews. She did not disavow her prior statements. Pam's testimony was subject to cross-examination, which included questioning about her inconsistent statements.

Also of critical importance is the fact that the interviews were not in evidence under MRE 703. Because Pam testified at trial, the prosecution had no need to admit the interviews as substantive evidence of defendant's guilt. This is in stark contrast to *Kowalski* where the damning evidence was defendant's confession. Defendant fails to indicate how the three interview tapes would have been admissible. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he

give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640–641; 588 NW2d 480 (1998).

Defendant's argument also fails because, even if Davis's testimony about police interrogation techniques would have assisted the trier of fact, there was never any indication that Pam was particularly susceptible to coercive techniques. In *Kowalski,* the Court ultimately agreed with the trial court and Court of Appeals that Leo's testimony was inadmissible because the data and methodology were unreliable. It also agreed that a portion of Wendt's testimony was inadmissible to the extent it indicated that the defendant's confession was consistent with the literature on false confessions. *Kowalski*, 492 Mich at 133-134. However, because Wendt's testimony also included the results of the defendant's psychological testing, additional inquiry was needed. The Court explained that "Wendt testified at length about the data he had gathered from an array of psychological tests he performed on defendant, his clinical interviews of defendant, and his review of the transcripts of defendant's interrogation. Wendt also explained the methods he applied to this data, how he compiled a psychological profile, and what opinions he formed from this analysis." *Id*. at 136. In remanding the case back to the trial court, the Court noted that "testimony like that Wendt proposed to offer can provide guidance to a fact-finder regarding behavior that would seem counterintuitive to a juror." *Id.* at 137.

In contrast, Davis never met Pam. There is no indication that Davis was even presented with any evidence about Pam, such as a psychological evaluation. Because the coercive police interrogation techniques also lead to true confessions[3], it would have been incumbent upon defendant to show that Pam was particularly susceptible to the techniques. An individual's psychological makeup is relevant to a determination as to whether the individual was more susceptible to coercive techniques. *Kowalski*, 492 Mich at 125-126. Here, the record was bereft of any evidence that Pam had any mental infirmities or personality traits that would support the notion that she made a false statement as a result of interrogation techniques.

Finally, the jury was presented with at least some testimony that Pam's memories may have been false memories. Davis testified that people such as therapists or police officers may suggest that an event is so important that it is unforgettable so that if an individual does not remember detail, they believe that the individual must "unblock" the alleged repressed memory, which is "a good recipe for creating some false memories." Some people have even provided detailed false memories of murdering family members "essentially through the way they're interviewed." An individual might guess if put under pressure. Multiple forensic interviews can create cumulative error. The "more suggestive interviews you're exposed to, the more memory

---

[3] See as examples: *People v Thames*, unpublished opinion per curiam of the Court of Appeals, issued October 17, 2013 (Docket No. 306313), slip op, p 4 ("although Dr. Campbell cited studies on false confessions and interrogation techniques, he admitted that police interrogation techniques increase both the likelihood of false confessions and true confessions."); *United States v Deuman*, 892 F Supp 2d 881, 886-887 (WD Mich 2012) ("coercive interrogation techniques also result in true confessions, likely more frequently than false confessions.")

is going to be affected as well as the person can become more and more likely just to go along to get along and get it over with."

In conclusion, the trial court did not abuse its discretion when it refused to permit Davis to testify as to specific police interrogation techniques and whether those techniques were applied to Pam during her three interviews. Because Pam's statements were not "confessions," they were not "counterintuitive" or "beyond the common knowledge of the ordinary person." Moreover, there was no evidence that Pam possessed certain personality traits that would have made her more susceptible to coercive tactics. Therefore, Davis's testimony would not have assisted the trier of fact on an important question. Moreover, the interviews were not in evidence, as required by MRE 703. Though excerpts from the various interviews were used to impeach Pam's testimony, the interviews were not introduced as substantive evidence. Pam did not disavow the statements, testified at trial, and was subject to cross-examination. The jury was also provided with limited testimony that Pam's interviews may have resulted in false memories. The trial court properly exercised its discretion.

## III. OTHER ACTS EVIDENCE

Defendant next argues that the trial court abused its discretion when it permitted the prosecutor to introduce evidence of "sexual jealousy" as a motive for the homicides where the probative value of the evidence was outweighed by its prejudicial effect. We disagree.

This Court reviews for an abuse of discretion a trial court's decision to admit so-called bad acts evidence. *People v McGhee*, 268 Mich App 600, 636; 709 NW2d 595(2005). A trial court does not abuse its discretion when it chooses an outcome within the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

Generally, to be admissible under MRE 404(b), bad acts evidence (1) must be offered for a proper purpose, (2) must be relevant, and (3) must not have a probative value substantially outweighed by its potential for unfair prejudice. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). A proper purpose is one other than establishing the defendant's character to show his propensity to commit the offense. *People v Johnigan*, 265 Mich App 463, 465; 696 NW2d 725 (2005).

"Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence." *People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001). Under this broad definition, evidence that is useful in shedding light on any material point is admissible. *Id.* at 114. To be material, evidence does not need to relate to an element of the charged crime or an applicable defense. *People v Brooks,* 453 Mich 511, 518; 557 NW2d 106 (1996). Rather, the evidence's relationship to the elements of the charge, the theories of admissibility, and the defenses asserted govern. *People v Yost*, 278 Mich App 341, 403; 749 NW2d 753 (2008).

Even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403; *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2001). Where requested, the trial court may provide a limiting instruction under MRE 105. *People v Sabin*, 463 Mich 43, 56; 614 NW2 888 (2000).[4]

Prior to trial, the prosecutor filed a notice of intent to introduce evidence of sexual conduct between defendant and his sister, Gail, as proof of motive. At the September 6, 2013, hearing on the motion, the prosecutor pointed out that defendant told his wife that he killed Gail and Rick because he did not want Rick to find out about the prior sexual conduct. That defendant and Gail had sexual encounters in their youth was not reasonably in dispute, by defendant's own frequent admissions to others and to the police. The prosecutor also argued that the evidence was not outweighed by unfair prejudice because "there can be no more probative testimony in a murder case than testimony about the motive for murder" and without the evidence "the jury doesn't have a complete picture of what happened here . . . [t]hey're going to look at the defendant and say, well, why would he do that? Well, we know why he did it and we have evidence to present to the jury and it should be presented."

Defense counsel pointed out that, while defendant may have admitted to a sexual relationship to a number of people, the only one who said that he also provided that as a motive was Pam. Defense counsel said that, even if arguably relevant, the evidence was weak, considering the fact that Rick and Gail had been married for over a year. Additionally, the past relationship may have provided a motive for killing Rick, but not Gail. Defense counsel argued that evidence that defendant committed incest was being used to "overcome the weakness of the case by showing that the defendant does something awful and tarring him with that brush rather than using the evidence."

The trial court concluded that the prosecutor had offered motive as a proper "non-character theory for his introduction of the evidence" and that defendant's relationship with Gail was relevant as to motive. The trial court further concluded that there was no danger of unfair prejudice, especially where there was a sound basis – i.e. defendant's own admissions – that the acts occurred. The evidence was "powerfully probative and certainly outweighs any unfair prejudice."

Later, at the hearing on defendant's motion for a new trial, the trial court defended its prior ruling:

> The defendant told his wife that this was his motive [sexual jealousy]. Surely, it's prejudicial. All evidence is. But how can a criminal defendant's stated motive in committing a crime be unfairly prejudicial? It goes to the essence of the case, the why. The why is always important even if the why is unattractive to a civilized society. The lack of a why would tend to support

---

[4] Defense counsel admitted that he did not request a limiting instruction: "It was an omission on my part, so I'm bringing that before the Court's attention at this point rather than have appellate counsel bring it up as a deficiency in my [re]presentation, to be quite honest with the Court."

innocence. The defendant said why he did it. The statements by the defendant that he killed his sister because of sexual jealousy are not other acts under MRE 404(b). They are simply statements of motivation and are not objectionable.

The trial court did not abuse its discretion when it permitted the prosecution to explore defendant's sexual relationship with Gail. It can be argued that MRE 404(b) was not even implicated because evidence that defendant had a prior sexual relationship with his sister was independently relevant as substantive evidence. Evidence is not subject to MRE 404(b) analysis simply because it discloses a bad act; bad acts can be independently relevant as substantive evidence. *People v Houston*, 261 Mich App 463, 468-469; 683 NW2d 192 (2004), disapproved on other grounds 473 Mich 399, 410 n 22 (2005). In *People v VanderVliet*, 444 Mich 52, 61-64; 508 NW2d 114 (1993), modified 445 Mich. 1205 (1994), the Michigan Supreme Court explained:

> Rule 404 is a rule of legal relevance, defined as a rule limiting the use of evidence that is logically relevant. Thus, Rule 404 presumes a showing of logical relevance. It is only then that considerations of legal relevance are implicated.

> On its face, Rule 404 limits only one category of logically relevant evidence. As we explained in *Engelman, supra*, at 212–213:

> > "[o]nly one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely ... to have committed the act in question." [Citing 2 Weinstein, Evidence, ¶ 404(8), p 404–52.]

> If the proponent's only theory of relevance is that the other act shows defendant's inclination to wrongdoing in general to prove that the defendant committed the conduct in question, the evidence is not admissible. The reason for the prohibition is twofold. As noted in *Engelman, supra* at 213 n 16, quoting *Imwinkelried, supra*, § 2:18, pp 48–49:

> > "[T]he thrust of this theory is the use of the defendant's uncharged misconduct as circumstantial proof of conduct. More specifically, the forbidden theory rests on two inferences that pose serious legal relevance issues.

> > "[T]he first step in this theory of logical relevance is inferring the defendant's character from the defendant's prior misdeeds. Rule 404(b) refers to this step as introducing the uncharged acts 'to prove the character of a person.' This step poses the legal relevance danger of prejudice. In the process of deciding whether to draw the inference, the jury must focus on the type of person the defendant is....

> > "The second step in this theory of logical relevance compounds the legal relevance dangers. The second step is inferring the defendant's conduct on a particular occasion from his or her subjective character. In

-15-

the words of Rule 404(b), the plaintiff or prosecutor introduces the evidence of the defendant's subjective character 'in order to show that he acted in conformity therewith.'

"When the proponent uses the defendant's subjective character as proof of conduct on a particular occasion, there is a substantial danger that the jury will overestimate the probative value of the evidence."

Rule 404(b) limits the use of logically relevant evidence only when both steps of the process are violated. Therefore, if the proffered other acts evidence is logically relevant, and does not involve the intermediate inference of character, Rule 404(b) is not implicated. [Footnotes omitted.]

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "Premeditation may be established through evidence of (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide." *People v Unger*, 278 Mich App 210, 229; 749 NW2d 272 (2008). "It is well settled that the intent to kill may be inferred from *any* facts in evidence." *Id.* at 223 (emphasis added). While motive is not an element of the crime, "evidence of motive in a prosecution for murder is always relevant." *Id.* Where, as here, the proofs are circumstantial, "evidence of motive is particularly relevant." *Id.*

Even if MRE 404(b) applies, the evidence was admissible because it was offered for a proper purpose and its probative value was not substantially outweighed by the danger of unfair prejudice.

## IV. GREAT WEIGHT/SUFFICIENCY OF THE EVIDENCE

Finally, defendant argues that his convictions cannot stand because the verdict was against the great weight of the evidence and there was insufficient evidence to support his convictions. We disagree.

"An appellate court will review a properly preserved great-weight issue by deciding whether 'the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Cameron*, 291 Mich App 599, 616–617; 806 NW2d 371 (2011) (citation omitted). However,

[w]hen analyzing a great-weight challenge, no court may sit as the "13th juror" and reassess the evidence. Therefore, *conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial.* To support a new trial, the witness testimony must contradict indisputable physical facts or laws, be patently incredible or defy physical realities, be so inherently implausible that it could not be believed by a reasonable juror, or have been seriously impeached in a case that was marked by uncertainties and discrepancies. [*People v Galloway*, 307 Mich App 151, 167; 858 NW2d 520 (2014) (internal citations and quotation marks omitted; emphasis added), quoting *People v Lemmon*, 456 Mich. 625, 636; 576 NW2d 129 (1998).]

Similarly,

> In determining whether the prosecutor has presented sufficient evidence to sustain a conviction, an appellate court is required to take the evidence in the light most favorable to the prosecutor and to ascertain whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses*. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime. Because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented. [*People v Bosca*, ___ Mich App ___; ___ NW2d ___ (Docket No. 317633, issued March 26, 2015) (internal citations and quotation marks omitted; emphasis added).]

As previously set forth, "[t]he elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *Bennett*, 290 Mich App at 472. "Premeditation may be established through evidence of (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide." *Unger*, 278 Mich App at 229. "It is well settled that the intent to kill may be inferred from *any* facts in evidence." *Id.* at 223 (emphasis added). While motive is not an element of the crime, "evidence of motive in a prosecution for murder is always relevant." *Id.* Where, as here, the proofs are circumstantial, "evidence of motive is particularly relevant." *Id.*

Moreover, identity is an element of every offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). The prosecution must prove the identity of the defendant as the perpetrator of the charged offense beyond a reasonable doubt. *People v Kearn*, 6 Mich App 406, 409; 149 NW2d 216 (1967).

On appeal, defendant treats his great weight and sufficiency arguments similarly. His focus is on the lack of evidence that defendant was the killer. Defendant argues that there were other theories that should have been pursued by police at the time of the murders and then again when the cold case team began its re-investigation. One such theory was that the Brinks were the unintended targets of a hit meant for their predecessor owner. Defendant presented a number of witnesses before the jury in support of this theory, including a glass expert who testified that the Blazer's passenger window had been broken from the outside, which he argued support his contention that the "hit" was carried out by more than one individual. The jury clearly rejected that theory. The jury also rejected the theory that Gail was the target of a "hit" because she had knowledge of alleged wrong-doing at work. In support of this theory, defendant presented witness Steven Prahl, who worked with Gail. He noticed that Gail went from being enthusiastic and energetic to less so in the two weeks before her murder. Prahl, in his brief eight-month tenure, discovered certain irregularities, but he had absolutely no idea whether Gail knew or not. As the prosecutor pointed out, Prahl, who actually confronted his employer with his findings, was still alive. Defendant implies that Gail's boss arrived at the crime scene in order to retrieve

company documents that Gail had at home, but the testimony did not support that theory. As this Court has recently reminded, "the prosecutor is not obligated to disprove every reasonable theory consistent with innocence to discharge its responsibility; it need only convince the jury in the face of whatever contradictory evidence the defendant may provide." *People v Bailey,* ___ Mich App ___; ___ NW2d ___ (Docket No. 318479, issued June 2, 2015), slip op, p 3 (internal quotation marks omitted).

Primarily, defendant attacks Pam's testimony as incredible. However, this Court is not at liberty to weigh witness credibility – that is a matter for the trier of fact. As previously discussed, the trial court did not abuse its discretion in limiting Dr. Davis's testimony because *Kowalski* has no application in this case.

Viewing the evidence in a light most favorable to the prosecution, defendant confronted Gail and Rick at their home that Saturday evening. He lured Rick outside by telling Rick he had car trouble. Once outside, defendant shot Rick multiple times in the head. Defendant then proceeded into the house where he found his sister asleep in bed. He shot her multiple times and then left. Defendant proceeded to Pam's house where he immediately revealed that he shot Gail and Rick. The next morning, defendant's friend Jimbo came over and defendant told Jimbo that his sister and Rick had died. This revelation came before the bodies were discovered. He took Pam to the scene and warned her not to go to police. Defendant offered witnesses who testified that it was "possible" that defendant and Pam were babysitting that night, but such equivocal testimony obviously did not sway the jury.

Given that this case was a credibility contest between defendant and Pam, the verdict was not against the great weight of the evidence and there was sufficient evidence to support defendant's conviction:

> Juries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony. Where sufficient evidence exists, which may be believed by the jury, to sustain a verdict of guilty beyond a reasonable doubt, the decision of the jury should not be disturbed by an appellate court. [*Bailey,* slip op, pp 3-4, quoting *People v Palmer,* 392 Mich 370, 376; 220 NW2d 393 (1974).]

Affirmed.

/s/ Michael J. Talbot
/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto

-18-